UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**SUSAN LYNN KUHN**,                                    Case No. 3:12 CV 654

                    Plaintiff,                          Magistrate Judge James R. Knepp II

           v.                                           MEMORANDUM OPINION AND
                                                        ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

                    Defendant.

## INTRODUCTION

Plaintiff Susan Lynn Kuhn seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. §§ 1383(c)(3) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 16). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

## BACKGROUND

Procedural History

On June 24, 2009, Plaintiff filed applications for SSI and DIB stating she was disabled due to seizures, herniated discs, and nerve damage, alleging a disability onset date of April 1, 2003, which she later changed to October 23, 2003. (Tr. 143, 164, 169). Her claims were denied initially (Tr. 84, 87) and on reconsideration (Tr. 94, 98). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 108). Born March 8, 1961, Plaintiff was 49 years old when the hearing was held on February 18, 2011 and turned 50 on March 8, 2011 – prior to the ALJ issuing

her decision on March 23, 2011. (Tr. 28, 33, 143). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled for purposes of DIB and not disabled for purposes of SSI prior to March 7, 2011. (Tr. 27–28, 33).

<u>Vocational History and Reports to the Agency</u>

Plaintiff's attorney submitted Plaintiff's school records and urged a supplemental evaluation by a mental health professional to obtain Plaintiff's current IQ scores, arguing the educational data showed extremely low scores. (Tr. 238). Plaintiff's high school grades indicated her GPA was generally between a 2.8 and 2.9. (Tr. 241). Her senior year, she attended only one class and spent the rest of her time in a work program. (Tr. 241). She graduated from high school, but reported she did so by attending special education classes. Although in one report Plaintiff said she completed high school and indicated she did *not* attend special education classes, other records show she did attend special education classes after second grade. (Tr. 57, 175, 244, 382). Her past work included jobs as a general laborer. (Tr. 170).

In July 2009, Plaintiff said her ability to work was limited by seizures, herniated discs, and nerve damage, which resulted in a limited range of motion, difficulty sitting and standing, and an inability to lift or carry. (Tr. 169). She said she stopped working on October 23, 2003 because she herniated two discs in her back after picking up supplies at work. (Tr. 169). Plaintiff said she could walk for about an hour but could not lift more than five pounds and needed her daughter's help with all housework. (Tr. 167). Plaintiff also said she did not drive due her medication, but she did not need an assistive device to aid with ambulation and thought she could climb stairs if she had to. (Tr. 167). Her reported symptoms included terrible pain, numbness, seizures, headaches, nausea, weakness, spasms, light headedness, fatigue, shortness or breath, confusion, cramping, high blood

pressure, and dropping things. (Tr. 187, 211). She said she took a number of medications, which improved her symptoms. (Tr. 174, 189, 213). Plaintiff later reported increasing problems with her lower back and significant depression. (Tr. 205).

Plaintiff said she lived in a house with her husband. (Tr. 215). Her daily activities included eating, going to the doctor, and resting. (Tr. 216). Plaintiff reported no problems with personal care, but said her daughter cooked meals for her, and her family took care of house and yard work. (Tr. 217–18). She said she shopped about once a week, could manage her money, and watched television. (Tr. 218–19). Plaintiff explained she talked on the phone every day and went out at least once a week, but needed someone to accompany her. (Tr. 219). She stated she followed instructions fairly well, though she indicated difficulty handling stress and changes in routine. (Tr. 220–21).

Medical History

On September 20, 2005, Plaintiff saw neurologist Dr. Scott T. Dull for a consultation at the request of her chiropractor Dr. Brohl, complaining of pain and numbness in her neck and upper back, headaches, muscle spasms, weakness in her right arm, and occasional left arm pain. (Tr. 251). Plaintiff believed the symptoms stemmed from a 2003 work injury. (Tr. 251). She had full motor strength but diffuse decreased sensation in her upper extremities, right more than left. (Tr. 252). Her reflexes were 3+ with a positive Hoffman's sign bilaterally. (Tr. 252). Though her gait was steady, Plaintiff's neck showed diminished range of motion and she had a positive Spurling sign. (Tr. 252). MRIs of her cervical spine showed broad-based herniated discs at C5-C6 and C6-C7, contributing to some foraminal stenosis. (Tr. 252). Dr. Dull concluded Plaintiff was symptomatic for disc herniations at C5-C6 and C6-C7 and suggested continuing conservative treatment involving cervical epidural blocks. (Tr. 252). He gave Plaintiff a prescription for Vicodin and said she could consider

3

surgical intervention if she did not significantly improve with pain management treatment. (Tr. 252).

On January 31, 2007, Plaintiff presented for an evaluation at Toledo Pain Services stating she still had significant pain after a series of cervical epidural injections. (Tr. 377). She continued to report numbness and tingling in her right arm but said her weakness had improved. (Tr. 377). The doctor briefly discussed surgical options, but Plaintiff was not interested in pursuing surgery. (Tr. 377). Plaintiff had no joint or muscle complaints and a normal neurological examination. (Tr. 378). However, notes indicated moderate tenderness in her cervical spine region and mildly restricted movement in her spine. (Tr. 378). She had normal muscle strength and tone and a normal right upper extremity examination, but her reflexes were somewhat abnormal. (Tr. 378–79).

Plaintiff returned to Toledo Pain Services approximately every other month until June 2010. At almost all these appointments, Plaintiff's physical examination revealed moderate tenderness in her cervical spine region, moderately restricted movement in her neck and back, and occasional muscle spasms, but no acute distress; normal muscle tone, strength, and stability; normal right upper extremity examinations; mobility and range of motion within normal limits; normal neurological examinations, including no difficulties in consciousness, memory, concentration, or general thought processes; normal reflexes; intact gait; and intact sensation. (Tr. 255, 259–60, 262, 265, 268, 272–73, 276, 279, 282, 290–91, 294–96, 315, 318, 322, 365–68, 370–73, 375–76, 408–09, 412–13).

On March 20, 2007, Plaintiff reported good relief from her current treatment regime and stated she was more comfortable with regular activity. (Tr. 375–76). On April 24, 2007, Plaintiff said she had a good response to her current treatment regime until she lifted a heavy pack of 24 water bottles, which caused increased pain. (Tr. 372). Her Lyrica dose was increased, and the physician added a prescription for Ultram. (Tr. 374). On June 26, 2007, Plaintiff reported her pain

4

was better, but she still had significant muscle spasms. (Tr. 370). However, she denied the need for a cervical epidural steroid injection. (Tr. 370). The doctor recommended aquatic therapy and continued her medications. (Tr. 371). Plaintiff returned on August 23, 2007 and said she still had significant muscle spasms. (Tr. 367). The doctor briefly discussed surgical intervention, but Plaintiff did not wish to pursue surgery. (Tr. 367). Plaintiff's Zanaflex and Lyrica doses were increased. (Tr. 369). On October 4, 2007, Plaintiff reported significant pain in her neck, numbness and tingling in her right arm, and a limited range of motion. (Tr. 365–66). On December 3, 2007, Plaintiff said pain in her cervical spine made it painful to lift her granddaughter, but she thought Lyrica and Zanaflex were "very effective". (Tr. 362).

On February 25, 2008, Plaintiff complained of pain, which "rarely radiate[d] to the right arm." (Tr. 293). She reported Zanaflex helped with her muscle spasms and her sleep had improved. (Tr. 293). Additionally, she said Lyrica was very effective and she improved with Ultram. (Tr. 293). She had no joint or muscle complaints. (Tr. 294–96). Plaintiff returned on April 21, 2008 complaining of cervical pain radiating into her right shoulder and arm. (Tr. 289). She also reported numbness and tingling in her right arm. (Tr. 289). Notes indicated Plaintiff's activities of daily living and recreation had not been impacted. (Tr. 289). Plaintiff reported her previous epidural injections provided 50 percent pain relief, and said she benefitted from Lyrica. (Tr. 289).

On May 20, 2008, an MRI of Plaintiff's cervical spine revealed mild degenerative changes likely most significant at C5-C6, where broad-based disc-osteophyte complex produced mild central canal stenosis and moderate bilateral neural foraminal narrowing. (Tr. 253). Between June 17, 2008 and December 3, 2008, Plaintiff reported persistent pain in the cervical spine region, occasional radiation to her right arm, numbness, dizziness, and limited range of motion. (Tr. 271, 275, 278,

281). She generally stated her medication was effective, once attributed her worsening pain to moving furniture, and the doctor consistently recommended cervical epidural injections. (Tr. 271, 274–75, 277–78, 280). Notes indicated she was compliant with pain treatment, with no evidence of medication mismanagement, misuse, or diversion. (Tr. 274, 276). Plaintiff received three cervical epidural steroid injections between January 26, 2009 and March 25, 2009. (Tr. 262, 265, 268). She experienced moderate relief after the first injection. (Tr. 265). Prior to her last injection her pain started to return, but she gained some relief from chiropractic treatment and traction. (Tr. 262).

On April 24, 2009, Plaintiff reported her current pain as a seven to eight out of ten and said she had benefitted from an increased dose of Lyrica. (Tr. 258). Plaintiff said there were days she could not do what she wanted to due to pain, but said she was trying to hold off on surgery. (Tr. 258). Physical examination revealed a slight decrease of sensation in her right upper extremity. (Tr. 260). There was no evidence of medication mismanagement, misuse, or diversion, and the physician recommended a cervical epidural injection. (Tr. 261). On June 29, 2009, Plaintiff reported her neck pain varied, with occasional numbness or weakness of her right arm, difficulty opening jars, and occasional dropping of objects. (Tr. 254). Notes stated Plaintiff's cervical pain was aggravated by some activities and somewhat relieved with heat and massage. (Tr. 254). Additionally, Plaintiff reported her previous epidural injections took "the edge off the pain", but her pain had since returned to pre-procedural levels. (Tr. 254). Plaintiff also reported she was doing more because she needed to care for her critically ill husband. (Tr. 254). She again said she was "trying to hold off" on surgery. (Tr. 254). There was a slight decrease in sensation in her right upper extremity, and the physician noted there was no evidence of "medication mismanagement/misuse/diversion". (Tr. 256–57).

6

On August 26, 2009, Plaintiff was in mild distress, had a slight decrease in sensation in her right upper extremity, and notes indicated she was compliant with pain treatment. (Tr. 321–23). Plaintiff's medications were continued and a cervical epidural injection was recommended. (Tr. 324). On October 19, 2009, Plaintiff reported similar cervical spine symptoms and notes indicated she was in moderate distress and compliant with her pain treatment. (Tr. 317–18). Plaintiff's right upper extremity exhibited a slight decrease in sensation, her medications were continued, and a cervical epidural injection was recommended. (Tr. 319–20).

On October 22, 2009, Plaintiff presented with posterior lumbar aching, burning, numbness, pain, a tingling sensation, and right hip, leg, and foot symptoms. (Tr. 314). Notes indicated she had treated lower back pain with a chiropractor and had been doing physical therapy without benefit. (Tr. 314). Physical examination showed mild reflex problems. (Tr. 315). Plaintiff's medications were continued and modified and a lumbar epidural injection was recommended. (Tr. 316). Several days later, a lumbar spine MRI revealed mild facet arthrosis inferiorly in the lumbar spine and very mild early degenerative disc disease without significant central canal stenosis or neural foraminal encroachment. (Tr. 313). On November 2, 2009, Plaintiff complained of three months of lower back pain and stated her pain was worse with a number of physical activities. (Tr. 307). The physician adjusted Plaintiff's medications and recommended epidural injections. (Tr. 308). On November 16 and 30, 2009, Plaintiff returned for lumbar epidural steroid injections. (Tr. 305–06). She complained of lower back pain on December 8, 2009 and reported 60 percent improvement in her right lower back following diagnostic testing, but said she had not received a significant benefit from the lumbar injections. (Tr. 417). Plaintiff was tender to percussion over the right sacral area. (Tr. 417). Another injection was scheduled, and she was to return after completing the series of injections. (Tr. 418).

On December 21, 2009 and January 18, 2010, Plaintiff received sacroiliac joint injections. (Tr. 415–16). She returned to Toledo Pain Services on March 22, 2010 and complained of neck and right arm pain, but said she had not been taking her pain medications for more than a month. (Tr. 411). She said she "realize[d] the medication was providing some relief." (Tr. 411). She was in mild distress and the physician suggested repeat cervical epidural injections, but Plaintiff was not interested. (Tr. 412–14). Her medications were continued, and the doctor discussed with Plaintiff the dangers of abruptly discontinuing her medication. (Tr. 414). On June 14, 2010, Plaintiff returned and complained of upper neck and right arm pain, explaining previous epidural injections had given her 30 percent relief for about two months, but she did not believe the relief warranted repeating the procedure. (Tr. 407). Notes also indicated surgery was not recommended. (Tr. 407).

Physician notes from July 23, 2010 stated Plaintiff had been swimming in a pool with her grandchildren. (Tr. 450). Notes also indicated she had no history of seizures, no history or risk of falls, no physical disability, no impaired mobility, and no weakness or unsteady gait. (Tr. 452). When Plaintiff saw treating physician Dr. Palla at the University of Toledo Medical Center (UTMC) for medication refills on August 24, 2010, and treatment notes indicated she had no history of seizures, no history or risk of falls, no physical disability, no impaired mobility, and no weakness or unsteady gait. (Tr. 445). Dr. Palla's notes from September 7, 2010 appeared to indicate Plaintiff reported taking her pills regularly. (Tr. 443). On November 16, 2010, when Plaintiff went to Dr. Palla her back was tender to palpation and notes stated Plaintiff should obtain MRI results and follow up with physical therapy. (Tr. 440). Plaintiff saw Dr. Palla again on December 7, 2010 complaining of back pain, with weakness or an unsteady gait. (Tr. 434). Notes stated pain medication helped Plaintiff's symptoms. (Tr. 434–35). Plaintiff said she had taken Vicodin that

8

morning, but her urine test was negative for any sign of pain medication. (Tr. 435). According to Dr. Palla, "on confrontation" Plaintiff said she took her medication regularly, but later said she probably was not taking it. (Tr. 435). When Plaintiff was advised to come back for another urine test, she walked out. (Tr. 435). Plaintiff saw Dr. Palla on December 21, 2010 to follow up, have medication refilled, and have disability paperwork filled out. (Tr. 428).

Chiropractic Evidence

Plaintiff also treated her pain symptoms by seeing chiropractor Dr. Brohl and the record contained numerous records from 2010. On January 11, 2010, Dr. Brohl stated Plaintiff had herniated discs with neck pain and right arm numbness, along with muscle spasms. (Tr. 380). He noted she had a limited range of motion in her spine and was limited in her ability to perform gross and fine manipulation due to arm pain and numbness. (Tr. 380). According to Dr. Brohl, Plaintiff gained temporary relief from chiropractic treatment and pain management, but these treatments did not completely eliminate her symptoms. (Tr. 380). However, her lumbar and cervical spine ranges of motion were generally better after chiropractic sessions and the treatment gave her some relief, as pain and tenderness decreased after sessions. (*See, e.g.,* Tr. 488–89, 492–97, 499–502, 505–14, 517–27). Though Plaintiff did at times present complaining of increased pain or a decreased range of motion, she explained she had good days and bad days, reported 55 percent improvement, and often had an explanation for her increased pain. (Tr. 495, 497, 503–07, 509, 512–16, 519, 525–27). For example, she reported increased soreness after receiving an injection in her lower back, after moving around a lot recently, and numerous times after lifting or giving piggy back rides to her grandchildren. (Tr. 497, 505, 507, 509, 526). During treatment, Dr. Brohl indicated a number of activities caused Plaintiff pain, such as sitting, bending, lifting, pushing, and pulling. (Tr. 504, 515).

9

Opinion Evidence

*Dr. William Bolz Physical Residual Functional Capacity (RFC) Assessment*

On September 29, 2009, Dr. Bolz opined Plaintiff could lift ten pounds frequently and twenty pounds occasionally; could stand, walk, or sit for about six hours in an eight-hour workday; and was unlimited in pushing and pulling. (Tr. 298). Additionally, he stated she should never climb ladders, ropes, or scaffolds. (Tr. 299). Dr. Bolz opined Plaintiff was limited to frequent gross and fine manipulation with her right arm and hand, and should avoid all exposure to hazards such as machinery and heights. (Tr. 300–01). He found Plaintiff partially credible. (Tr. 302).

*Dr. Palla – Treating Physician Physical RFC Assessment*

On December 21, 2010, Dr. Palla completed a physical capacities evaluation opining Plaintiff could sit for one hour at a time, for a total of two hours in an eight-hour workday, and could stand or walk for a half hour at a time, for an hour total in an eight-hour work day. (Tr. 427). Additionally, she indicated Plaintiff needed to change positions often, alternating between sitting, standing, and laying down; should avoid hazardous, dangerous, and moving machinery; would need to leave her work station at least once an hour to stretch in a sedentary job; needed to lie down periodically to relieve pain; and would likely miss at least three days of work per month. (Tr. 427). She further stated Plaintiff could lift only five pounds. (Tr. 427).

*Dr. Brohl – Chiropractor Physical RFC Assessment*

In February 2011, Dr. Brohl found Plaintiff could sit for one hour at a time, for a total of four hours in an eight-hour workday, stand for one hour at a time, for a total of four hours, and walk for two hours at a time, for a total of four hours. (Tr. 528). He stated she often needed to alternate

between sitting, standing, and laying down, but said she did not need to lie down periodically throughout the day to relieve pain. (Tr. 528). Dr. Brohl stated that even in a sedentary job, Plaintiff would need to leave her work station periodically to stretch, and he opined she would likely miss at least three days of work per month. (Tr. 528). Dr. Brohl believed Plaintiff could lift twenty pounds occasionally and ten pounds frequently. (Tr. 528).

*Dr. James Bruce Kelly – Psychological Consulting Assessment*

Plaintiff underwent a psychological evaluation with Dr. Kelly on February 12, 2010. (Tr. 381). Plaintiff told Dr. Kelly she had not driven for several months because she feared medication and pain would make it unsafe. (Tr. 381). She also reported she completed high school with below-average grades and received special education services. (Tr. 382). Dr. Kelly noted Plaintiff had never received mental health treatment and did not use psychiatric medications. (Tr. 382). Plaintiff said she could not work due to her medications and back pain, and Dr. Kelly felt Plaintiff was reasonably accurate, credible, and consistent with other information. (Tr. 383). During the evaluation, Plaintiff was generally cooperative but often vague. (Tr. 383). Her language skills were within normal limits and she followed oral directions without confusion. (Tr. 383). Plaintiff did not express feelings of guilt, hopelessness, or worthlessness. (Tr. 383). She reported having a low mood about once a week and said her activities were often reduced by her pain level. (Tr. 384).

Based on Plaintiff's responses to a number of questions, Dr. Kelly believed Plaintiff's current cognitive skills were in the average range, and he noted she appeared to comprehend and use judgment appropriately. (Tr. 385). He stated she had sufficient judgment to make important life decisions and independently manage her funds. (Tr. 385). Plaintiff said she was responsible for laundry, cooking, and grocery shopping, indicating she did "OK but . . . walking bother[ed] her

11

because of pain". (Tr. 386).

Dr. Kelly concluded Plaintiff presented "with an insufficient number of endorsed symptoms for a diagnosis of mental illness or cognitive disorder." (Tr. 386). He noted she could complete self care and light house work, and could manage her funds because she demonstrated "the cognitive ability to make change, purchase items at the store and budget[] household decisions". (Tr. 386). Dr. Kelly believed Plaintiff was not impaired in her ability to relate to others or understand, remember, and follow instructions. (Tr. 387). He believed she was mildly impaired in maintaining attention, concentration, persistence, and pace for simple repetitive tasks and withstanding the stress and pressure associated with daily work activity. (Tr. 387). Later, consulting psychologist Dr. Caroline Lewin determined Plaintiff had no medically determinable mental impairment. (Tr. 391–404).

ALJ Hearing

At the hearing, Plaintiff's attorney stated she was still pursuing Plaintiff's school records and thought they could ultimately show Plaintiff was more limited mentally. (Tr. 38). The ALJ noted Plaintiff would be turning 50 shortly after the hearing, at which point she thought Plaintiff would be disabled under the grid if limited to sedentary work. (Tr. 39). The ALJ asked Plaintiff's attorney if she wanted to withdraw the DIB application and pursue only the SSI application, with the understanding she might be found disabled as of her fiftieth birthday. (Tr. 39–40). However, Plaintiff's attorney responded that because Plaintiff was married and her spouse earned income, she probably would not receive any money through SSI. (Tr. 39–41).

Plaintiff testified she completed high school in special education classes after doing full-time work study her senior year, described her work history as a laborer, and said she stopped working in October 2003 due to back problems. (Tr. 42–45, 56–58). She explained she still had trouble with

12

reading, comprehension, and math, and had never used a checkbook. (Tr. 58). Plaintiff felt unable

to work because it took time to walk distances, it was difficult to sit for long periods or lift, and she

was constantly in pain. (Tr. 46). She thought she could lift no more than five pounds, sit for half an

hour, stand for an hour, and walk long enough to spend an hour in a store. (Tr. 50–51). Though she

testified stairs took time, bending hurt, her right arm shook, and she dropped things, she stated she

did not use an assistive device and could dress herself. (Tr. 52, 59). She said she could make a

sandwich and shop for groceries, but her adult daughter and husband helped her. (Tr. 54). Plaintiff

testified she could drive, but was restricted to driving during the day due to vision problems and did

not drive often. (Tr. 54–55).

The VE stated her testimony was consistent with the *Dictionary of Occupational Titles

(DOT)* and she would notify the ALJ if any of it diverged from the *DOT*. (Tr. 62). The ALJ posed

a number of hypotheticals to the VE, including the one representing the RFC she ultimately

determined for Plaintiff: sedentary work, defined as lifting up to ten pounds occasionally; standing

and walking for about two hours; sitting for up to six hours; no climbing of ladders, ropes, or

scaffolds; no more than frequent fine or gross manipulation with the right upper extremity; avoiding

all exposure to moving machinery and unprotected heights; no complex written or verbal

communication; only simple, routine, and repetitive tasks performed in an environment free of fast-

paced production requirements; involving only simple work-related decisions and routine workplace

changes. (Tr. 66, 68–69). The VE testified such a person could work as a sorter (120,000 jobs in the

national economy; 3,000 in Ohio) or bench assembler (240,000 jobs in the national economy; 5,000

in Ohio). (Tr. 69). The VE further stated an employer would not generally allow more than fifteen

absences per year and could not tolerate an employee being off-task more than twenty percent of the

time. (Tr. 70). Additionally, she said the sedentary occupations would allow for a sit/stand option, with a reduction of twenty percent in the number of jobs. (Tr. 71). She noted the *DOT* does not account for sit/stand options, but was testifying based on her professional experience. (Tr. 71).

Responding to a hypothetical posed by Plaintiff's attorney, the VE stated a person could not work if she could only sit for an hour at a time and two hours total; stand for half an hour at a time and one hour total; walk for half an hour at a time and one hour total; needed to change positions often, alternating between sitting, standing, and lying down; must avoid hazards; would have to leave her workstation periodically every hour to stretch; would have to lie down periodically; would likely miss more than three days per month; and could only lift five pounds. (Tr. 71–72). Focusing only on the limitation to five pounds, the VE testified it would reduce the identified job numbers by 30 percent. (Tr. 73). Plaintiff's attorney asked the VE to provide local job numbers, and the VE stated she would submit the numbers after the hearing. (Tr. 74–78).

ALJ Decision

The ALJ determined Plaintiff's date last insured was December 31, 2008. (Tr. 21). She found Plaintiff suffered from the following severe impairments: cervical mild degenerative changes likely most significant at C5-C6 where broad based disc-osteophyte complex produced mild central canal stenosis and moderate bilateral foraminal narrowing (left worse than right); and lumbar spondylosis without myelopathy. (Tr. 22). However, the ALJ concluded these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Supbart P, Appendix 1. (Tr. 22). After considering all the evidence, the ALJ determined Plaintiff had the following RFC:

> [She can] perform sedentary work . . . with the following limitations: no climbing
> ladders ropes or scaffolds; frequent handling of objects, defined as gross
> manipulation, with the upper extremity; frequent fingering of objects, defined as fine
> manipulation of items no smaller than the size of a ball point pen, with the right

14

upper extremity; avoid all exposure to moving machinery and unprotected heights. [Plaintiff] is also limited to occupations that do not require complex written or verbal communication and jobs involving only simple, routine and repetitive tasks performed in a work environment free of fast paced production requirements involving only simple work related decisions and routine work place changes.

(Tr. 22–23). The ALJ summarized Plaintiff's reports and testimony regarding her activities and difficulties, along with her treatment notes. (Tr. 23–24). She concluded treatment notes did not support a level of severity precluding all work, and noted Plaintiff pursued conservative treatment without choosing surgical intervention, despite her complaints of severe pain. (Tr. 23–24). Additionally, the ALJ noted a number of normal objective physical examinations and drew attention to indications of medical noncompliance and dishonesty, stating Plaintiff admitted she was not taking her medications regularly on confrontation by her physician and walked out when advised to come back for another urine specimen. (Tr. 24).

The ALJ gave the consulting physician's physical RFC opinion only partial weight because additional evidence suggested Plaintiff was more limited. (Tr. 24). She gave treating physician Dr. Palla's opinion partial weight because she found treatment records did not support it, and Plaintiff did not always take her medication, making restrictions based on subjective complaints less reliable. (Tr. 24). The ALJ followed a similar approach with Dr. Brohl's opinion, giving it great weight with regard to Plaintiff being incapable of more than sedentary work, but not with regard to the opined level of severity. (Tr. 25). Regarding mental limitations, the ALJ gave great weight to Dr. Kelly's consulting examination, which did not diagnose mental illness or cognitive disorder, found Plaintiff could perform daily functioning including self care and light housework, and could manage her funds and make budgeting decisions. (Tr. 25). Additionally, the ALJ noted Plaintiff completed high school, worked at substantial gainful activity levels in the past, and had no difficulty responding to

15

questions at the hearing. (Tr. 25). She explained she imposed mental limitations on the RFC "out of an abundance of caution, and giving [Plaintiff] the benefit of all doubt". (Tr. 25).

Relying on VE testimony, the ALJ found that prior to March 7, 2011 – when Plaintiff turned 50 and her age category changed – she was not disabled because she could perform jobs existing in significant numbers in the national economy. (Tr. 26–27). The ALJ then found Plaintiff was disabled under Medical-Vocational Rule 201.14 from March 7, 2011 through the date of the decision. (Tr. 27). Finally, the ALJ determined Plaintiff was not disabled at any time prior to December 31, 2008, her date last insured. (Tr. 27). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

16

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

17

## DISCUSSION

Plaintiff argues the ALJ erred in assessing her credibility, weighing opinion evidence, determining Plaintiff has a high school education, relying on VE testimony Plaintiff contends was inconsistent with the *DOT* and RFC, and determining a significant number of jobs existed that Plaintiff could perform. (*See generally* Doc. 13).

As a preliminary matter, the Court addresses Plaintiff's claim for DIB. To qualify for DIB, Plaintiff must have been under a disability as of the date her insured status expired on December 31, 2008. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a), 404.320(b)(2); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Plaintiff contends she was disabled between October 23, 2003 and December 31, 2008 and thus should succeed on her claim for DIB. Though Plaintiff saw Dr. Brohl for chiropractic treatment from 2004 onward (Tr. 528), the record did not contain all his treatment notes and the transcript contains only sparse medical records between 2005 and early 2007. In 2005, Dr. Dull recommended only conservative treatment, but told Plaintiff she could consider surgery if she did not significantly improve. (Tr. 252). When she returned for pain management evaluation in January 2007, Plaintiff said she still had significant pain but was not interested in pursuing surgery. (Tr. 377–78). Doctors suggested surgery again in 2007, but Plaintiff still was not interested in it. (Tr. 367). Additionally, in 2007 and 2008 Plaintiff's physical examinations were generally normal, showing few abnormal findings, and she said her medications improved her symptoms. (Tr. 272–73, 276, 279, 282, 290–91, 294–96, 365–68, 370–73, 375–76). And at least once when she reported an increase in pain, it was due to heavy lifting. (Tr. 372).

Simply put, the evidence prior to Plaintiff's date last insured does not establish she was entitled to DIB. Though Dr. Brohl's opinion stated Plaintiff had been on restrictions since 2004 (Tr.

18

528), the evidence does not support a conclusion that Plaintiff was limited to less than sedentary work at any time, and specifically prior to December 31, 2008. Therefore, she has failed to demonstrate the Commissioner erred in determining she was not entitled to DIB.

Credibility Analysis

Plaintiff argues the ALJ improperly assessed her credibility by placing too much emphasis on the December 2010 medical record showing Plaintiff had not been taking her pain medication. (Doc. 13, at 12–13).

The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination.").

Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other

19

symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

Plaintiff suggests the ALJ should have questioned her about her noncompliance if she intended to rely on it as a determinative factor in the credibility finding and contends "a single medical notation does not support an adverse credibility finding." (Doc. 13, at 12–13). However, the ALJ relied on more than "a single medical notation". The ALJ stated she could not find Plaintiff credible "because of the significant inconsistencies in the record as a whole." (Tr. 26). Specifically, the ALJ noted Plaintiff's activities of daily living, including being able to drive, grocery shop, complete self care and light housework, and manage household budgeting decisions; the fact that she did not use assistive devices to aid ambulation; Plaintiff's conservative treatment approach, including instances in which Plaintiff opted not to pursue surgery; numerous physical examinations with normal findings; generally good results from pain management treatment; and MRI findings showing only mild degenerative changes. (Tr. 23–25).

20

The record supports the ALJ's findings. Plaintiff told the agency she shopped once a week and could manage her money, and she testified she could drive short distances during the day. (Tr. 54–56, 218–19). She reported she did not need an assistive device and could climb the stairs if she needed to. (Tr. 167). Additionally, Plaintiff said she graduated from high school and could follow instructions well. (Tr. 56–58, 220–21). Despite continued reports of pain, Plaintiff declined surgery multiple times and also declined additional cervical epidural injections, even though she said these gave her a period of relief. (Tr. 254, 258, 367, 370, 377, 407, 412–14). Also, though Plaintiff frequently reported pain and said she dropped things, her physical examinations were almost always normal, including examinations of her upper right extremity. (Tr. 255, 259–60, 262, 265, 268, 272–73, 276, 279, 282, 290–91, 294–96, 315, 318, 322, 365–68, 370–73, 375–76, 408–09, 412–13). Further, Plaintiff reported her medications worked well, and when she reported increased pain it was often because she had stopped taking her medications or over-exerted herself. (Tr. 254, 258, 271, 278, 289, 293, 362, 372, 411, 434–35, 497, 505, 507, 509, 526). Due to this substantial evidence and evidence of noncompliance the ALJ did not err finding Plaintiff less than credible.

Evaluation of Opinion Evidence

*Treating Physician Dr. Palla*

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating

physicians." *Rogers*, 486 F.3d at 242. A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009). Good reasons are required even when the ALJ's conclusion may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows his physician has deemed him disabled and might be bewildered when told by an ALJ he is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id*.

22

Plaintiff argues the ALJ should have given controlling weight to Dr. Palla's opinion that she was limited to less than sedentary work. (Doc. 13, at 13–15). In deciding to give Dr. Palla's opinion only partial weight, the ALJ stated Plaintiff's treatment records did not support the severity of Dr. Palla's limitations. (Tr. 24). This is true and provides a "good reason" for rejecting Dr. Palla's opinion. As discussed above, in addition to signs of medical noncompliance, Plaintiff repeatedly said she was not interested in surgery and pursued only a conservative treatment approach. In addition, her physical examinations were almost entirely normal despite her subjective complaints. The ALJ agreed with Dr. Palla that Plaintiff could not perform more than sedentary work, but did not find it accurate that Plaintiff was limited to less than that. Plaintiff's own reports of activities were inconsistent with Dr. Palla's opinion, as Plaintiff stated she could walk for an hour at a time to grocery shop but Dr. Palla said she could walk no more than a half an hour at a time. (Tr. 51, 427). And though Dr. Palla stated Plaintiff could not lift more than five pounds, nothing in the record supports this because Plaintiff's upper extremity examinations repeatedly showed normal muscle strength and tone and no instability. (*See, e.g.,* Tr. 255, 259–60, 262, 265, 268, 272–73, 276, 279, 282, 290–91, 294–96, 315, 318, 322, 365–68, 370–73, 375–76, 378–79, 408–09, 412–13, 427).

Given Plaintiff's choice to pursue only conservative treatment, her normal physical examinations, and indications that Plaintiff did not always take her medications as prescribed, but felt they relieved her symptoms when she did take them, the record does not support the extent of Dr. Palla's restrictions. Substantial evidence supports the ALJ's decision to give her opinion only partial weight, and she gave good reasons for giving Dr. Palla's opinion partial weight to the extent she thought Plaintiff was limited to less than sedentary work.

*Chiropractor Dr. Brohl*

Similar to her arguments regarding Dr. Palla's opinion, Plaintiff contends the ALJ should have given greater weight to Dr. Brohl's opinion that she was limited to less than sedentary work. (Doc. 13, at 15–17). As a chiropractor, Dr. Brohl is not an accepted medical source, but his opinion could be used "to show the severity of [Plaintiff's] impairment(s) and how it affect[ed] [her] ability to work." 20 C.F.R. § 404.1513(a), (d). Plaintiff argues that although Dr. Brohl's opinion "may not be entitled to the weight given to that of a treating physician . . . it should have been considered as part of the entire record." (Doc. 13, at 15). She further alleges the ALJ failed to apply appropriate factors in rejecting Dr. Brohl's opinion. (Doc. 13, at 15).

The ALJ explicitly addressed Dr. Brohl's opinion as part of the entire record, giving great weight to the extent Dr. Brohl found her incapable of more than sedentary work, but not with regard to the severity of limitations imposed. (Tr. 25). When considering opinions from non-medical sources who have seen plaintiffs in a professional capacity, the ALJ should look to several factors, including the opinion's consistency with other evidence, how long the source has known the individual, and how well the source explained his opinion. *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 820 (N.D. Ohio 2009) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)). Here, the ALJ explained he gave limited weight to Dr. Brohl's opinion because Plaintiff's treatment records did not support the level of severity he opined, the restrictions were not fully consistent with Dr. Palla's restrictions, and to the extent Dr. Brohl's opinion was based on Plaintiff's subjective complaints, Plaintiff had been found only partially credible. (Tr. 25).

As was Dr. Palla's opinion, Dr. Brohl's opinion that Plaintiff was limited to less than sedentary work was inconsistent with the treatment records as a whole. In addition to normal

physical examinations, instances of noncompliance, and an unwillingness to pursue surgery to treat her allegedly disabling pain, Dr. Brohl's records revealed that on several occasions when Plaintiff complained of increased pain, it was because she had moved around a lot recently, lifted her grandchildren, or given them piggy back rides – not because she experienced an increase of pain from performing sedentary activities. (Tr. 497, 505, 507, 509, 526). Because Dr. Brohl's opinion was inconsistent with substantial evidence, the ALJ did not err in assigning only partial weight to it.

High School Education

Despite her testimony and other repots that she graduated from high school (Tr. 57, 175, 241, 382), Plaintiff argues she "lacks the skills denoted by a high school education" (Doc. 13, at 17–18). Specifically, she argues she does not have the reasoning, arithmetic, and language skills acquired through formal schooling at a twelfth grade level because she completed high school through special education classes and attended a work program her senior year, has trouble with reading and comprehending, and has never used a checkbook. (Doc. 13, at 17–18). Plaintiff also complains that she was not given IQ tests. (Doc. 20, at 6).

The ALJ properly concluded Plaintiff had a high school education. Plaintiff stated numerous times that she completed twelfth grade and graduated. (Tr. 57, 175, 382). Further, the ALJ correctly noted that Dr. Kelly's consultatitive examination revealed no evidence of cognitive dysfunction. (Tr. 26, 386). At the evaluation, Plaintiff's language skills were within normal limits, she followed oral directions without confusion, and she appeared to comprehend and use judgment appropriately. (Tr. 383, 385). Indeed, Plaintiff herself reported she followed instructions fairly well and had no problems managing money. (Tr. 219–20). This corroborates Dr. Kelly's finding that Plaintiff had the cognitive ability to make change, purchase items, and budget household decisions. (Tr. 386).

And as the ALJ stated, Plaintiff had no difficulty responding to questions posed to her at the hearing. (*See* Tr. 25, 35–75). Although Dr. Kelly found no evidence of cognitive impairment and said she was not impaired in following instructions and only mildly impaired in concentration, persistence, and pace, and although the state agency consultant found she had no medically determinable mental impairment (Tr. 386–88, 391–401), the ALJ – "in an abundance of caution, and giving [Plaintiff] the benefit of all doubt" – limited her to jobs that do not require complex communications, involving only simple, routine, and repetitive tasks, performed in an environment free of fast-paced production requirements, and involving only simple work-related decisions and routine workplace changes. (Tr. 23, 25). Given the evidence that Plaintiff has no cognitive dysfunction, corroborated by her statements about her ability to follow directions and manage money and her presentation to Dr. Kelly and the ALJ, and with Plaintiff's testimony and reports that she completed high school, the ALJ did not err by finding Plaintiff has a high school education.

VE Testimony and Step 5

Plaintiff argues two points regarding VE testimony. First, she argues "it is clear" Plaintiff could not do the jobs the VE identified, suggesting the ALJ should have perceived a conflict between the VE's opinion and the job requirements listed in the *DOT*. (Doc. 13, at 20–21). Second, Plaintiff argues the VE did not establish a significant number of jobs Plaintiff could perform. (Doc. 13, at 21–23).

*VE Testimony and the DOT*

SSR 00-4p imposes on ALJs "an affirmative responsibility to ask about any potential conflict between that VE . . . evidence and information provided in the DOT." SSR 00-4P, 2000 WL 1898704, *4. The ALJ must ask the VE if her evidence conflicts with the *DOT*, and if the VE's

26

evidence appears to conflict, the ALJ must obtain a reasonable explanation for the apparent conflict. *Id.* When the VE's evidence conflicts with the *DOT*, the ALJ "must resolve this conflict before relying on the VE". *Id.* In *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006), the court considered a challenge that the *DOT* conflicted with the VE's testimony. There, the ALJ asked if there was a conflict and the VE testified there was not. *Id.* As it turned out, there actually was a conflict, but the plaintiff had not brought the discrepancy to the ALJ's attention. *Id.* Holding the ALJ had not erred, the court stated:

> Consistent with the SSR 00-4p, the ALJ asked if there was a conflict. The vocational expert testified that there was not. [The plaintiff] did not bring the vocational expert's mistake to the ALJ's attention. Nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct independent investigation of the testimony of witnesses to determine if they are correct.

*Id.* (internal citations omitted). Because the plaintiff had not notified the ALJ of the conflict, the ALJ did not err by relying on VE testimony. *Id.*

Though *Martin* was an unreported case, the Sixth Circuit incorporated its logic into *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009), noting, "Lindsley's claim amounts to the contention that the ALJ did not interrogate [the VE] with sufficient rigor about potential conflicts . . . . But [the VE] credibly testified that there was no such conflict. And Lindsley was afforded a full opportunity to cross-examine [him]. The ALJ had no duty . . . to interrogate him further." *Id.* The Sixth Circuit and Northern District of Ohio have consistently applied the rule that an ALJ need not conduct her own investigation into a VE's testimony to determine its accuracy where the ALJ asked the VE if his testimony was consistent with the *DOT*, the VE answered affirmatively, and the plaintiff failed to bring any conflict to the ALJ's attention. *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008); *Langford v. Astrue*, 2010 WL 3069571, *6 (N.D. Ohio 2010); *Stern v. Comm'r of*

27

*Soc. Sec.*, 2011 WL 6780889, *6 (N.D. Ohio 2011), *adopted by* 2011 WL 67800883; *Heffelfinger v. Astrue*, 2012 WL 1004722, *7–8 (N.D. Ohio 2012); *Mataraza v. Astrue*, 2012 WL 5996072, *9–10 (N.D. Ohio 2012), *adopted by* 2012 WL 5995987). *Langford* involved a plaintiff arguing the jobs cited by the VE required capabilities beyond those the ALJ listed in the hypothetical, but the court held her argument failed even if she were correct regarding the existence of a conflict, because she had not brought the conflict to the ALJ's attention. *Langford*, 2010 WL 3069571 at *6. "Where the ALJ questions the VE and the VE testifies . . . there is no conflict with the DOT, . . . the ALJ is under no further obligation to interrogate the VE, especially where the plaintiff is afforded a full opportunity to cross-examine the VE." *Heffelfinger*, 2012 WL 1004722 at *7.

Here, at the beginning of the VE's testimony, the ALJ asked her, "[W]ould you let me know if any of your testimony today diverges from the *DOT*?" (Tr. 62). The VE responded, "I will." After the ALJ questioned the VE and the VE identified jobs for the ALJ's posed hypotheticals, the ALJ again asked, "[H]as all your testimony today been consistent with and according to the *DOT*?" (Tr. 70). Again, the VE responded, "Yes". (Tr. 70). The ALJ asked one more question, about a sit/stand option, and the VE specifically testified that her testimony was based on professional experience because the *DOT* does not account for a sit/stand option. (Tr. 71). Plaintiff's attorney then cross-examined the VE on a number of issues, but failed to challenge her previously-identified jobs as conflicting with the *DOT*. (Tr. 71–75). Because the ALJ asked the VE if her testimony was consistent with the *DOT*, the VE responded that it was, and Plaintiff failed to challenge the VE's identified jobs as inconsistent with the *DOT* despite the opportunity to cross-examine her, the ALJ fulfilled her duty and did not err in accepting the VE's testimony as credible regarding jobs identified for the hypothetical person.

28

*Significant Number of Jobs Established*

"[W]ork exists in the national economy when it exists in significant numbers either in the region where [a plaintiff] lives or in several other regions of the country." 20 C.F.R. § 404.1566(a). It does not matter whether work exists in the immediate area the plaintiff lives; a specific job vacancy exists for the plaintiff; or the plaintiff would be hired if she applied for work. *Id.* "Isolated jobs" existing only in very limited numbers in relatively few locations outside the region where the plaintiff lives do not qualify as work existing in the national economy. *Id.* at § 404.1566(b).

There is no "special number which is to be the boundary between a 'significant number' and an insignificant number of jobs." *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). *Hall* established a number of criteria a judge should consider in determining whether work exists in significant numbers, but the ALJ need not explicitly consider each factor. *Id.*; *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999). Further, "the test is whether work exists in the national economy, not in the plaintiff's neighborhood", and "[t]he Commissioner is not required to show that job opportunities exist within the local area." *Id.* (citing *Dressel v. Califano*, 558 F.2d 504, 508–09 (8th Cir. 1977)); *see also Phillips v. Astrue*, 2011 WL 5526079, *11 (N.D. Ohio 2011) ("Plaintiff's contention that the VE should have provided numbers of jobs in the local economy lacks merit . . . ."); *Rosado v. Comm'r of Soc. Sec.*, 2011 WL 5434087, *4 (N.D. Ohio 2011) (relying on national numbers absent an indication that jobs are concentrated in a few areas). And the Sixth Circuit has found as few as 125 jobs in a local geographic area and 400,000 jobs nationwide constituted significant jobs. *Stewart v. Sullivan*, 1990 WL 75248, *4 (6th Cir. 1990).

Here, the VE testified Plaintiff could perform two jobs, totaling 360,000 jobs in the national economy and 8,000 jobs in Ohio. (Tr. 69). When Plaintiff's counsel asked the VE about local job

numbers, the VE responded she did not have those numbers available but could supplement the record with them after the hearing, but she did not do so. (Tr. 73--74). As *Harmon* and the cases following it make clear, though, the ALJ was not required to show job opportunities existed in the local economy, and the fact that a plaintiff may live some distance from the nearest metropolitan area is extrinsic to the question of disability and not to be considered. *Harmon*, 168 F.3d at 292. The ALJ identified 360,000 jobs in the national economy Plaintiff could perform, with 8,000 of these jobs in Ohio. The Sixth Circuit has previously held 400,000 jobs in the national economy was a significant number, and in one case even held 70,000 jobs in the national economy constituted a significant number. Thus, Plaintiff failed to show substantial evidence did not support the ALJ's step five finding that Plaintiff could perform work existing in significant numbers in the national economy.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

    s/James R. Knepp, II    
United States Magistrate Judge
